IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| PPG INDUSTRIES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:10-CV-73 |
| | ) | |
| LEE PAYNE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This civil action is before the court on "Plaintiffs' Motion for Summary

Judgment on Defendants' Counterclaims" [doc. 207]. Defendants[1] have responded [doc.

215], and plaintiffs have submitted a reply [doc. 216]. Oral argument is unnecessary, and the

motion is ripe for the court's consideration and determination.

Defendants filed counterclaims for intentional interference with prospective

business relationships, outrageous conduct, abuse of process/malicious prosecution,

malicious prosecution, and violation of the Lanham Act. For the reasons that follow, the

motion will be granted, and defendants' counterclaims will be dismissed.

---

[1] Individual defendants, Lee Payne, Mark Payne, Joey Payne, and Christian Crumley were
the original defendants. Plaintiffs added Mil-Spec Coatings & Supply, LLC as a defendant in the
amended complaint [doc. 25]. Depending upon context, use of the term "defendants" herein may
at times refer only to the individual defendants.

# I.

## *Background*

In 2003, David Payne, the father of defendants Lee Payne, Joey Payne, and Mark Payne, sold his paint business in Knoxville, Tennessee to PPG.[2]  The Payne brothers all worked in David Payne's business.  After the sale, the brothers went to work for PPG.  Two of the Payne Brothers, Mark and Joey, worked as sales reps for PPG while Lee Payne worked in sales and eventually became PPG's Regional Sales Manager. Lee Payne hired Chris Crumley for his sales team.  The new business sold paint and paint related products to contractors, painters, builders, and other commercial buyers.  All of the defendants entered into employment agreements with PPG, but the agreements with Joey Payne and Crumley included non-compete provisions.

For a variety of reasons, the defendants decided to leave their employment with PPG.  Defendants planned to open a paint business, Mil-Spec Coatings & Supply, in Knoxville.  The company's paint supplier would be Color Wheel.  Mark Payne, Joey Payne, and Crumley resigned on the afternoon of Friday, February 19, 2010, and gave two-weeks notice.  A sales representative in Alabama who had been meeting with Lee Payne, Joe Mitchell, also resigned on February 19th.  Mitchell planned to join the Payne Brothers in the new Mil-Spec business.  On Saturday, February 20, 2010, Bud Moses, the district manager and defendants' direct supervisor, sent an email to Cliff Carlson, the Central and East Zone

---

[2] Plaintiffs herein will be referred to as "PPG."

Director in which he stated, "I want to crush these guys now." On Sunday morning, February 21, 2010, Lee Payne resigned his position with PPG.

Prior to their resigning, defendants emailed to their homes hundreds of pages of documents containing information sensitive to PPG such as budgets, operating expenses, prices, and finances. Defendants' position is that PPG knew defendants had this information and failed to conduct exit interviews in which the information could have been requested by PPG and returned by defendants. Their contention is that by not conducting exit interviews and debriefing as PPG policy requires, PPG was able to set in motion its plan to destroy defendants and their new business. PPG's position is that sending the emails with the information they contained constituted misconduct, which resulted in their notifying law enforcement, filing this lawsuit, and notifying customers of the employee departures while reassuring the customers of continued service.

In letters to the Payne Brothers and Crumley dated February 24, 2010, counsel for PPG informed them that they had confidential information that had not been returned and he instructed them to contact Moses immediately to make arrangements for the return of the information. The defendants attended a trade show in Florida from February 25, 2010, to March 1, 2010. On March 2, 2010, defendants met with Moses and returned the materials in their possession.

PPG sent a letter to its major customers dated March 1, 2010, and signed by Cliff Carlson, Zone Sales Director, and Kurt Christian, Zone Operations Director, that stated

3

in relevant part:

> Dear Valued PPG Customer:
>
> The purpose of this letter is to inform you of PPG personnel changes in the Tennessee Valley area, and assure you that these changes will have absolutely no impact on PPG's commitment and ability to service your business.
>
> In late February several members of the PPG sales and service team abruptly resigned, and immediately began a working relationship with a PPG competitor. While it is not uncommon in today's business environment for employees to change organizational loyalties, the circumstances of this particular situation and the manner in which it transpired are a cause of great concern at PPG.

Mike Walker, a paint company owner, has testified that PPG employees told him that PPG was never going to let Lee Payne open a competing business and that PPG would shut him down. The PPG employees told Walker that the information came from Moses. Walker also stated that he received the same information directly from Moses. According to Walker, Moses also told him that PPG had deeper pockets than the defendants and they would shut the defendants down by keeping them tied up in court.

In early March 2010, Dave Hinds, PPG's Risk Manager, investigated the defendants' departures and became aware of the documents defendants had sent to themselves. After consulting with Regis Becker, PPG's Chief Compliance Officer, Becker recommended that the document situation be reported to the FBI.

On March 1, 2010, PPG filed this lawsuit seeking injunctive relief and damages against defendants. PPG filed an amended complaint adding as a defendant Mil-Spec

4

Coatings & Supply LLC, which it says was formed by Lee Payne on October 16, 2009. In April 2010, PPG sought a TRO against defendants based on its contention that defendants were about to open or were already operating their competing business. The court denied the TRO. Defendants filed a series of counterclaims which are now before the court on PPG's motion for summary judgment.

## II.

### Standard of Review

Plaintiffs' motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.[3] Rule 56(a) sets forth the standard for summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not

---

[3] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. The Advisory Committee Notes to the 2010 amendments reflect that the standard for granting summary judgment "remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying [that standard]." Fed. R. Civ. P. 56 advisory committee's note.

5

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.


III.

*Analysis*

<u>Intentional Interference with
Prospective Business Relationships</u>

In order to establish a claim for intentional interference with business relationships, a plaintiff must demonstrate the following:

6

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation and footnotes omitted).

The fourth element of the tort requires either improper motive or improper means. The court in *Trau-Med* held that in order for the plaintiff to demonstrate an improper motive by the defendant, the plaintiff has to prove that the defendant's "predominant purpose was to injure plaintiff." *Id*. at 701 n.5. *Trau-Med* was not in the context of competitors seeking the same business nor was the competitor's privilege at issue. However, *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169 (Tenn. Ct. App. 2007) involved tortious interference with business relationships among competitors. In that case, the Court of Appeals concluded that "the Tennessee Supreme Court, faced with the direct question, would hold that a competitor enjoys a privilege as to the improper motive requirement of the fourth element of the tort of intentional interference with business relationships." *Id*. at 184. Nevertheless, "even if a competitor enjoys a privilege that negates the improper motive requirement, it is not insulated from liability if the other requirement is present, *i.e.*, improper means." *Id*. Some examples of improper means include the following:

7

means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id*. (citations omitted).

Defendants base their intentional interference with prospective business relationships on PPG's plan to crush them; the letter sent to PPG's customers; PPG's alleged misrepresentations to the FBI; the pricing scheme related to and spying on customers of Mil-Spec; and the loss of numerous customers. PPG argues *inter alia* that defendants have not established the loss of numerous customers by any improper motive or action by it, and thus defendants cannot establish the element of damages. PPG also contends that defendants have not established an identifiable class of third persons with whom they had a prospective business relationship.

Initially, the court observes that defendants sufficiently identified the class of prospective third persons. "The Tennessee Supreme Court's use of the word 'identifiable' is an attempt to place some limits on the tortious interference with *prospective* business relations claim." *Assist-2-Sell, Inc. v. Assist-2-Build, LLC*, No. 1:05-CV-193, 2005 WL 3333276, at *6 (E.D. Tenn. Dec. 6, 2005). "[A] plaintiff in Tennessee needs to identify specific third parties for an *existing* business relationship but only a class of third persons for

8

*prospective* business relationships. This difference suggests Tennessee does not require a plaintiff to identify specific individuals when making a tortious interference with prospective business relations claim." *Id.* at *7 (internal quotation marks and citations omitted). Defendants have identified potential customers, many of whom they knew as paint-buying customers prior to defendants' employment with PPG as a class of third persons. Defendants know the local paint business and no doubt would have had an identifiable base of customers for their new business. The difficulty for defendants, however, is that even if defendants can show improper means, or raise a question of fact regarding that element, they do not have proof of damages in relation to this customer base to establish the fifth element of the tort and defeat summary judgment.

This case involves direct competitors, and PPG would be subject to the competitor's privilege regarding the showing of a bad motive for element four of the tort. *Watson's Carpet*, 247 S.W.3d at 184. Defendants can still demonstrate this element by showing improper means. *Id*.

Defendants argue that the customer letter sent by PPG interfered with their business. The letter itself, however, does not demonstrate improper means. The content, which does not identify the defendants by name, reflects PPG's effort to reassure its customers of continued service in spite of the abrupt departure of its sales force. While defendants take umbrage with the language used by PPG that the circumstances caused it "great concern," such was undoubtedly the case for PPG at that time. The letter on its face

9

does not demonstrate an improper means of interfering with defendants' business prospects.

Defendants refer to PPG's "predatory pricing" scheme as part of their plan to shut them down. Predatory pricing is a concept that can be found in the context of antitrust actions and "means pricing below some appropriate measure of cost." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.8 (1986).[4] The record does not show that PPG sold its products below cost, but rather greatly reduced its profit margin in aggressively competing for the same business Mil-Spec sought. Defendants have not shown that PPG engaged in a "predatory" pricing scheme as that concept is defined under the law.

Nevertheless, the testimony of Terry Matthews, a former PPG sales representative who worked under Moses, arguably raises questions concerning the propriety of the means employed by PPG to get business from Mil-Spec. Moses instructed his sales staff go to defendants' place of business, watch for customers and then follow the customers to beat Mil-Spec's price. Moses told the sales staff to beat Mil-Spec's prices no matter what as they intended to shut their doors. Matthews was instructed to beat Mil-Spec's price even if PPG lost money. The aggressive price reduction to sell the paint at far below the normal

---

[4] Predatory pricing is not a simple concept as there is debate over what "cost" is relevant. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117 n.12 (1986). Only below cost prices will suffice in the context of the antitrust laws. *Advo, Inc. v. Philadelphia Newspaper, Inc.*, 51 F.3d 1191, 1198 (3rd Cir. 1995) (The Supreme Court recently reaffirmed that "the reasoning in both [*Matsushita* and *Cargill*] suggests that only below-cost prices should suffice, and [that it has] rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)). The other required showing is that there is a "reasonable prospect" . . . "a dangerous probability, of recouping [the] investment in below-cost prices." *Id.* at 224 (citations omitted).

profit margin of 40 or 50 percent was employed with customers only if Mil-Spec was also

bidding for the business. Thus, a company one time might get paint at greatly reduced price

because Mil-Spec was involved, but the same company would be subject to PPG's standard

price margins on any job if Mil-Spec was not involved. Matthews testified in his deposition

as follows:

> Q.    In the sense that the price that you've successfully
> chosen for these customers who Color-Wheel is
> competing against PPG they're getting a break, aren't
> they?
>
> A.    Yes, sir.
>
> Q.    And if Color-Wheel were not in the bidding - -
> competitive bid process you would have sold that
> customer at the normal profit margin - -
>
> A.    Correct.
>
> Q.    - - within 40 or 50 percent profit margin?
>
> A.    Correct.
>
> Q.    So what that customer is getting is really two things; he's
> getting a break because someone at Color-Wheel is
> trying to get their business; is that correct?
>
> A.    Yes, sir.
>
> Q.    And, secondly, they're being lied to by PPG?
>
> Q.    In the sense that PPG is not doing what they normally
> would do?
>
> A.    Yes, sir.

. . .

> Q.  . . . Let's just use Buchanan Paint as an example. If Color-Wheel is in the bid process and you put that in the comments, you can sell to Buchanan at a 25-percent profit margin, for example?
>
> A.  Yes, sir.
>
> Q.  Okay. And that would have been approved by Bud Moses?
>
> A.  Yes, sir.
>
> Q.  The next day you're trying to sell Buchanan on a different job and Color-Wheel is not in the picture, you're going to sell them at the normal profit margin rate, aren't you?
>
> A.  Yes, sir.
>
> Q.  And if you try to go as low as 25 percent, Color-Wheel is not in the bid, you're not going to get approved?
>
> A.  Correct.

Arguably, there is a question concerning the manner employed by PPG to obtain business defendants were also engaged in trying to obtain through competitive bidding.

With that having been noted, however, defendants have to demonstrate damages to establish this tort. At this late juncture of the litigation,[5] defendants have offered as proof of damages the loss of one customer, Danny Ledford, the owner of D.T.'s Refurbishing, a company that paints apartments and does commercial painting as well.

---

[5] This case has been ongoing for two years and is set for trial on June 11, 2012. The discovery by both sides has been voluminous as evidenced by the record.

12

Ledford testified in deposition that he was no longer doing business with Lee Payne as Mil-Spec because of Payne's involvement with this ongoing lawsuit. His concern is that he orders tinted paints in high volume and if Lee Payne and his company did not survive financially from this lawsuit, he would be scrambling to change paint with another paint company. Ledford also testified that he did not see the letter PPG sent to its customers, though a letter might have been sent to his office manager. In addition, Ledford stated he did not hear anyone at PPG say anything negative about the defendants or make reference to PPG putting the defendants out of business.

Nothing in Ledford's testimony shows that PPG acted in a way that improperly damaged defendants. His reasons for not doing business with Lee Payne and Mil-Spec are not connected with any alleged improper means used by PPG. The fact that Ledford chose not to do business with Lee Payne because of his involvement with a "big" and "costly" lawsuit is not a basis for establishing damages for the tort of interference with business relationships. Such a decision was made based on Ledford's business needs and those needs potentially not being met because the supplier is in litigation. Ledford was not influenced by the customer letter nor any negative comments about the defendants. In short, the loss of this customer's business does not sustain a claim for damages regarding this tort.

In addition, Ledford is the only customer whose business is used by defendants' financial witness to calculate damages for the claim based on intentional interference with prospective business relationships. The financial witness, Glenn Perdue,

prepared a report dated February 10, 2012, a time well into this litigation and well after considerable discovery has been undertaken. However, with regard to the damages for this claim, other than Ledford's D.T. Refurbishing, his references to damages are vague, speculative, and not sufficient to survive summary judgment. Perdue states that he reviewed "over 30 customer declarations" which deal with the customers' history and relationship with the various defendants. He then concludes that "it is *possible* that various Milspec customer relationships have been affected by actions of PPG in a manner that caused economic harm." (emphasis added).

At the summary judgment stage, the nonmoving party must present probative evidence to support its claim to defeat summary judgment. The "possibility" that there might have been economic harm at this stage is not probative evidence nor does it raise a question of fact as to the existence of such damages. "The 'mere possibility' of a factual dispute is not enough" to defeat summary judgment. *Mitchell,* 964 F.2d at 582. In their brief, defendants argue in support of their damages the loss of Ledford's business and additionally that their "expert has provided economic damages calculations based upon the Lanham Act violations." A calculation of damages under the Lanham Act does not translate into a showing of damages based upon PPG's intentional interference with defendants' business relationships by improper means. The elements of the two claims are different, and damages are sustained by different means. Defendants are required to show that they were damaged by PPG's intentional interference with their potential business relationships, and they simply

14

have not presented probative proof that they sustained such damages.   The fifth element of the tort has not been demonstrated, and that fact entitles PPG to summary judgment on the claim.

<u>Outrageous Conduct/Intentional</u>
<u>Infliction of Emotional Distress</u>

Defendants have asserted a claim for outrageous conduct based on their contention that PPG plotted to crush defendants and do whatever was necessary to drive them out of business, including trying to bankrupt them with attorneys' fees.   Defendants also contend that PPG employed unfair litigation tactics, predatory pricing, and misinformation to the FBI.

Outrageous conduct and intentional infliction of emotional distress are the same cause of action.  *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).  There are three elements to this cause of action under Tennessee law: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Id*. at 622 (citations omitted).  In *Bain*, the Tennessee Supreme Court also noted that it has "adopted and applied the high threshold standard described in the Restatement (Second) of Torts" for determining when particular conduct is tortious. *Id*. at 622-23.  The Court stated:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. **Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.** Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id*. at 623 (emphasis added). "[T]he outrageousness requirement is an 'exacting standard' which provides the primary 'safeguard' against fraudulent and trivial claims." *Doe I v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 39 (Tenn. 2005) (quoting *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)).

"It is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Thus, the trial court may reasonably dismiss this legal theory as a matter of law." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (internal citation omitted); *see also Vanderbilt Univ. v. Pesak*, No. 3:08-cv-1132, 2011 WL 4001115, at *13 (M.D. Tenn. Sept. 8, 2011) ("It is the Court's duty in the first instance to apply the standard and make a

16

preliminary determination as to 'whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'") (citing *Bain*, 936 S.W.2d at 623).

PPG contends that the conduct cited by defendants does not meet the high and exacting standard required to establish this claim, nor does it compare to the conduct described in the cases cited by defendants. PPG argues that its actions of sending a letter to its customers and making a complaint to the FBI for "suspected theft"were in response to defendants' misconduct of transferring documents. PPG contends that it was within its rights to report defendants' conduct concerning the documents to the FBI and that there is nothing "outrageous" about the letter itself. PPG also argues that there is no evidentiary basis for defendants' statement that PPG lied to the FBI and no showing by defendants how the amount it has spent on attorneys' fees constitutes outrageous conduct unacceptable to society. In addition, PPG points out that the comments regarding "crushing" the defendants and "shutting them down" is language and hyperbole of business competition.

The standard that must be met to establish the tort of intentional infliction of emotional distress or outrageous conduct is indeed a high and exacting one. In the court's opinion, the conduct attributed to PPG does not meet this standard. The cases cited by defendants illustrate conduct and a factual circumstances unlike those in this case. In *Johnson v. Woman's Hospital*, 527 S.W.2d 133 (Tenn. Ct. App. 1975), a hospital employee showed grieving parents the shriveled body of their premature infant in a jar of

17

formaldehyde.  *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004) involved a husband who saw his wife shot in the head and the shooter then kill himself.  Defendants also rely on *Moorhead v. J.C. Penney Co.*, 555 S.W.2d 713 (Tenn. 1977) in support of their claim. That case also involves facts and conduct distinguishable from that attributable to PPG.

In *Moorhead*, the plaintiffs, a married couple, maintained a credit card account with Penneys.  They made a return for $16.78; however, the following month their account showed a charge for that amount rather than reflecting a credit.  In spite of repeated calls to Penneys to correct the error, the plaintiffs continued to receive almost daily threatening letters from Penney's collection agency.  The plaintiffs received abusive phones calls as well as a total of forty-two threatening letters.  The phone calls threatened a lawsuit and impugned the financial reputation of the husband of the couple.  The Tennessee Supreme Court found that Penney's conduct constituted outrageous conduct, and also found significance in the fact that the letters and phone calls had "continued long after defendant had acknowledged that its accounts were in error and that plaintiffs owed it nothing."  *Id*. at 717.  The Court additionally found noteworthy that the conduct extended over a one-year period and the significant volume of the threatening letters.  *Id*.

Defendants argue that if Penney's conduct constitutes outrageous conduct then surely PPG's conduct in this case does.  Again, the conduct and factual context in *Moorhead* are different than this case.  *Moorhead* involved innocent customers who had clearly been wrongly threatened and subject to abusive behavior as a result of Penney's mistake.  The

situation involved threatening and abusive conduct that persisted over a year, with a significant volume of letters. The instant case involves business competitors, although the defendants are individuals. PPG reacted when the defendants all resigned at the same time and prior to their leaving emailed PPG information to themselves. That situation rapidly turned into an acrimonious lawsuit. PPG's conduct does not equate with Penney's treatment of the plaintiffs in *Moorhead*.

In addition, the amount PPG has spent on attorneys' fees, the letter sent to its customers, and PPG's complaint to the FBI are not themselves evidence of outrageous conduct nor do they support the claim. Many litigants, both corporate and individual, spend large sums in attorneys' fees, but such conduct is not outside the bounds of civilized society. While defendants take exception to the letter PPG sent to its customers, the content of the letter and the language used by PPG are not on their face atrocious or beyond the bounds of decency. Defendants are not even identified by name in the letter. Defendants' view of PPG's complaint to the FBI clearly differs from PPG's. Yet the record does no reflect that PPG's contact with the FBI is sufficient to meet the high and exacting standard of this tort.

Likewise with regard to the statements that PPG wanted to "crush" the defendants and "shut the doors" of Mil-Spec, the court does not believe that these statements rise to the outrageous conduct/intentional infliction of emotional distress standard. The context of this conduct is the highly competitive arena of corporate America. Business competitors use strong language and hyperbole when referring to competitors. Several courts

19

have noted such language.

In an action for alleged violation of the Sherman Act for predatory pricing, the

Third Circuit noted the following in the context of intent:

> Advo officials themselves have used aggressive-sounding
> language. Its CEO, Robert Kamershcen, once directed his
> managers "to seize the OPPORTUNITY inherent in the
> stumbling PROBLEMS of the newspaper industry," and quoted
> McDonald's founder Ray Kroc for the advice that "[w]hen [you]
> see the competition drowning, . . . stick a water hose down their
> throats."
>
> The antitrust statutes do not condemn, without more, such
> colorful, vigorous hyperbole; there is nothing to gain by using
> the law to mandate "commercially correct" speech within
> corporate memoranda and business plans. Isolated and
> unrelated snippets of such language provide no help in deciding
> whether a defendant has crossed the elusive line separating
> aggressive competition from unfair competition.

*Advo, Inc. v. Philadelphia Newspaper, Inc*., 51 F.3d 1191, 1199 (3rd Cir. 1995) (internal

quotation marks and citation omitted). In another case dealing with alleged predatory

pricing, the Seventh Circuit observed the following regarding the issue of intent in such

cases:

> Firms "intend" to do all the business they can, to crush their
> rivals if they can. [I]ntent to harm without more offers too
> vague a standard in a world where executives may think no
> further than "Let's get more business."
> . . .
> Almost all evidence bearing on "intent" tends to show both
> greed-driven desire to succeed and glee at a rival's predicament.
> Take, for example, the statement David Rust made to Phillip
> Gressell: "We are going to run you out of the egg business.
> Your days are numbered." Undoubtedly Rust wanted to leave

20

> Gressell scratching in the dust, but drive to succeed lies at the
> core of a rivalrous economy. Firms need not like their
> competitors; they need not cheer them on to success; a desire to
> extinguish one's rivals is entirely consistent with, often is the
> motive behind, competition.

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989)

(internal quotation marks and citation omitted).

In this case, the statements attributable to PPG of the desire or intent to "crush"

the defendants and "close their doors" need to be viewed in the context of the business

culture of competition and rivalry. In the court's opinion, the language and hyperbole of the

competitive corporate arena, at least in this case, do not rise to the high standard required to

establish a claim for intentional infliction of emotional distress/outrageous conduct under

Tennessee law. Accordingly, summary judgment as to this claim is appropriate.


<u>Abuse of Process</u>[6]

Defendants base their abuse of process claim on PPG's alleged attempts to shut

down Mil-Spec and prevent competition from the Paynes in spite of not having evidence that

the Paynes were using proprietary information belonging to PPG. Defendants also base their

claim on alleged excessive litigation tactics by PPG.

---

[6] In the amended counterclaim, defendants list this claim as "Abuse of Process/Malicious
Prosecution." Under Tennessee law, these are two distinct torts with different elements that must
be demonstrated in order to establish liability. Therefore, the court has considered the claims
separately as argued by PPG.

21

In order to prevail on a claim for abuse of process, a plaintiff must establish two elements: "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Givens v. Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002) (internal quotation marks and citations omitted). "Within the context of a tortious abuse of process, process refers to times when the authority of the court is used." *Vanderbilt Univ.*, 2011 WL 4001115, at *11(quoting *Rentea v. Rose*, No. M2006-02076-COA-R3-CV, 2008 WL 1850911, at *4 (Tenn. Ct. App. Apr. 25, 2008)). "'Process' is defined as 'that which emanates from or rests upon court authority and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act.'" *Id*. (citing *Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, No. 03A01-9707-CV-00292, 1998 WL 24414, at *2 (Tenn. Ct. App. Jan. 20, 1998)).

"[T]he gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." *Givens*, 75 S.W.3d at 400 (internal quotation marks and citations omitted). "The test as to whether process has been abused is 'whether the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do.'" *Id*. at 401 (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 143-44 (Tenn. 1939)). The intended goal of an action for

22

abuse of process is to keep parties through the use of litigation from pursuing objectives

other than those stated in the lawsuit, for example, using the court's process as a weapon to

obtain a collateral goal. *Id.* "[T]he mere existence of an ulterior motive in doing an act,

proper in itself, does not suffice; there must be such a use of it as in itself is without the scope

of the process, and hence improper." *Bell*, 1998 WL 24414, at *2 (quoting *Priest*, 125

S.W.2d at 143).

In the discovery context, the Tennessee Supreme Court in *Givens* held that

abuse of process will lie when:

> (1) the party who employs the process of a court specifically and
> *primarily* intends to increase the burden and expense of
> litigation to the other side; and (2) the use of that process cannot
> otherwise be said to be for the legitimate or reasonably
> justifiable purposes of advancing [the party's] interests in the
> ongoing litigation.

*Givens*, 75 S.W.3d at 402.

The litigation in this case has been contentious since its inception. However,

contentious litigation does not automatically translate into an abuse of process case. Both

sides have engaged in extensive use of discovery, and both sides have sought relief from the

court related to that discovery. Defendants complain about a "document dump" made by

PPG of thousands of pages of documents not properly segregated, for which they obtained

relief from the court. Yet defendants issued a third set of interrogatories and a seventh

request for production of documents. Defendants also noticed out-of-state depositions [docs.

226, 227] that PPG moved for a protective order to prevent [doc. 228], and PPG was

23

successful in obtaining relief from the court [doc. 237]. PPG points out that defendants have made multiple e-discovery requests that have required its counsel to review tens of thousands of e-documents at considerable expense. PPG also argues that defendants have identified 56 witnesses and seek two weeks to try this case, as opposed to PPG's contention that it can be tried in one week. PPG further points out that defendants filed a 46 page brief in response to their 16 page memorandum concerning the pending motion for summary judgment. In short, PPG contends that a lot of the money it has spent in this case about which defendants complain has been necessary to respond to defendants' tactics.

This case involves an amended complaint asserting seven claims for relief and an amended counterclaim with a total of five claims for relief. The court has considered the history of this case regarding the filings with the court and the discovery record. Again, the litigants are contentious and clearly do not like each other. Such is the circumstance with many cases. Furthermore, many cases involve a large corporate entity opposing one or more individuals, with both sides generating considerable discovery requests and other filings with the court. The case history and discovery record in this case do not indicate that the court's process has been abused by PPG. Therefore, summary judgment on that claim is appropriate.

Malicious Prosecution

Defendants also assert a claim for malicious prosecution based on PPG's filing of a criminal complaint with the FBI and their seeking a temporary restraining order ("TRO")

24

in this case.

To establish a claim for malicious prosecution, a plaintiff must demonstrate the following: "(a) that a prior lawsuit or judicial proceeding was brought against the plaintiff without probable cause, (b) that the prior lawsuit or judicial proceeding was brought against the plaintiff with malice, and (c) that the prior lawsuit or judicial proceeding terminated in the plaintiff's favor." *Lane*, 334 S.W.3d at 761 (quoting *Parrish v. Marquis*, 172 S.W.3d 526, 530 (Tenn. 2005)). "[N]ot just *any* . . . outcome favorable to the original defendant will support the favorable termination element." *Anderson v. Wal-Mart Stores, Inc.*, No. 1:07-00024, 2008 WL 1994822, at *4 (M.D. Tenn. May 2, 2008) (quoting *Parrish*, 172 S.W.3d at 533) (internal quotation marks omitted).

> Rather, the termination must also reflect the merits and not merely a procedural victory. If a court concludes that the termination does not relate to the merits-reflecting on neither innocence of nor responsibility for the alleged misconduct- the termination is not favorable in the sense that it would support a subsequent action for malicious prosecution.

*Id*. (citing *Parrish*, 172 S.W.3d at 531) (internal citations and quotation marks omitted); *see also Sewell v. Par Cable, Inc.*, 1988 WL 112915, at *3 (Tenn. Ct. App. Oct. 26, 1988) ("For the purposes of a malicious prosecution action, a favorable termination must be one indicating that the accused is innocent. . . . A disposition that does not indicate the plaintiff's innocence is not considered a favorable termination . . . ." (citations omitted)). When making a determination whether a result was a favorable termination, "a court must examine the circumstances of the underlying proceeding." *Parrish*, 172 S.W.3d at 531.

25

As to the first element, "probable cause exists when there are such facts and circumstances sufficient to create in a reasonable mind the belief that the accused is guilty of the crime charged." *Coleman v. Lauderdale Cnty.*, No. W2011-00602-COA-R3-CV, 2012 WL 475606, at *5 (Tenn. Ct. App. Feb. 15, 2012) (internal quotation marks and citations omitted). "A party asserting a claim of malicious prosecution bears a heavy burden of proof in establishing the element of lack of probable cause. . . ." *Id*. (internal quotation marks and citations omitted). "Probable cause is determined from an objective examination of the surrounding facts and circumstances at the time the underlying prosecution was initiated." *Id*. (internal quotation marks and citations omitted). Further, "[probable cause exists where the party who instituted the underlying legal proceedings had a reasonable belief in both the existence of facts supporting his or her claim and that those facts made out a legally valid claim." *Id*. (citation omitted).

Defendants' malicious prosecution claim fails because they cannot demonstrate two of the required elements. Initially, defendants cannot bear the "heavy burden of proof" to show the lack of probable cause. The record clearly reflects that when they left their employment with PPG defendants emailed themselves hundreds if not thousands of pages of documents with company information concerning pricing, costs, customers, etc. Further, the complaint that Hinds made to the FBI concerning the taking of these documents moved through the process at the FBI to the point it was considered by an agent or agents.

26

Nevertheless, the probable cause element aside, defendants cannot establish the third required element for a malicious prosecution claim, that the prior lawsuit or judicial proceeding was terminated in their favor. Defendants contend that bringing the TRO in this case was a prior action that was concluded in their favor. Seeking the TRO was a procedure in this lawsuit, which obviously has not been terminated. That contention fails.

With regard to the referral to the FBI for possible violation of the Economic Espionage Act ("EEA"), that prior proceeding has not been sufficiently "terminated" to meet the requisite criteria for a favorable termination.

> [The] termination must *reflect* on the merits of the underlying action. That is, the termination must not only be favorable to the [defendant in the underlying proceeding], but must also reflect the merits and not merely [be] a procedural victory. In short, if the reason for dismissal is not inconsistent with a defendant's wrongdoing, it will not be considered a favorable termination.

*Anderson*, 2008 WL 1994822, at *5 (internal quotation marks and citations omitted). Defendants' criminal counsel Deno Cole testified that during his last conversation with Agent Houghton of the FBI it seemed clear to him that the FBI was not going to pursue the case. However, Cole remains under a retainer contract with these defendants should something arise since the statute of limitations has not run on a charge under the EEA. In addition, the reasons Cole related as those given by the FBI for not pursing the case do not reflect the merits of the case or the innocence of the defendants. Cole testified that the FBI agent told him there were certain thresholds they look at, and in that context he mentioned resources and time. Cole also opined regarding the resources issue that the computer crimes

27

unit of the local FBI was particularly taxed after the Sarah Palin trial. Nothing in the record regarding the FBI's decision not to pursue an indictment of the defendants reflects their innocence or the merits of the case. *Cf. Anderson*, 2008 WL 1994822, at 6 ("The decision to divert the charges was not inconsistent with the defendant's having actually committed the charged offense, and it did not reflect on the merits of the underlying action."). Thus, the "termination" of the FBI inquiry is a procedural victory at best and does not meet the favorable termination element for a malicious prosecution claim. Accordingly, defendants are unable to establish a malicious prosecution claim, and summary judgment as to that claim is appropriate.

## Lanham Act

Defendants base their Lanham Act claim on § 1125 which provides in pertinent part as follows:

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
> . . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

28

15 U.S.C. §§ 1125(a)(1), (a)(1)(B).  The foregoing provision creates a cause of action for false or misleading advertising under the Lanham Act.  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 613 (6th Cir. 1999).

To demonstrate a cause of action for misleading advertising, a plaintiff must establish the following:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Id*. (citation omitted).  A claim under the Lanham Act must be based upon a statement of fact, not an opinion.  *Id*. at 614.

Defendants are seeking monetary damages from PPG based on this claim. "When a plaintiff seeks an award of monetary damages for false or misleading advertisement under the Lanham Act, he may show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing."  *Id*. at 614.  When statements are literally false, actual deception is presumed, so evidence that statements actually mislead consumers is not required.  *Id*.

> Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product).  A plaintiff

> relying upon statements that are true yet misleading cannot
> obtain relief by arguing how consumers could react; it must
> show how consumers actually do react.

*Id*. (internal quotation marks and citation omitted). Whether a statement is ambiguous is a

question of law. *Id*. at 615 n.2. "Proof of actual deception requires demonstrating that

consumers were actually deceived by the defendant's ambiguous or true-but-misleading

statements. Successful plaintiffs usually present evidence of the public's reaction through

consumer surveys. There must be evidence that a 'significant portion' of the consumer

population was deceived." *Id*. at 616 (citations omitted).

Defendants base their Lanham Act claim on the PPG's customer letter,

comments made to Mike Walker by PPG employees about shutting down Mil-Spec and

putting defendants in bankruptcy, and PPG's pricing scheme to take business from Mil-Spec.

PPG counters that there is nothing false or misleading in the customer letter; that the

statements to Walker are one-on-one statements to a customer that do not give rise to a

Lanham Act claim along with the fact that Walker continued doing business with defendants;

and that there is no evidence of statements by PPG regarding pricing made to customers, let

alone any false statements, and there is no evidence that PPG's pricing constituted

commercial advertising, promotion, or a predatory pricing scheme. PPG also argues that

defendants have not established a causal link between any alleged improper statements and

harm to defendants as required to establish a Lanham Act claim. The court will address these

arguments in order.

30

Defendants contend that the customer letter falsely states that the defendants left "abruptly" and under circumstances causing PPG "great concern" and falls within the "commercial activities" language of § 1125. According to defendants, the letter impugns their integrity regarding their business conduct, i.e., their "commercial activities." There is nothing false in the letter. Initially, the court notes that the defendants are not identified by name in the letter. Further, the record reflects that all of the defendants did in fact suddenly leave their employment with PPG, a situation which PPG characterized as "abrupt." Three defendants resigned at the same time on a Friday afternoon, and the fourth individual, Lee Payne, resigned two days later, the Sunday morning following the initial resignations. The circumstances of defendants having emailed sensitive PPG documents to themselves prior to leaving no doubt did cause PPG "great concern" at the time. Defendants' characterization of the letter as being false is misplaced.

At most the statements in the letter are true yet misleading or confusing, or ambiguous, since a customer reading the letter is left to discern what is meant by "great concern." This characterization of the statements does not, however, benefit defendants or enable their claim to survive. As referenced above, a claimant relying on true but misleading or ambiguous statements must show how consumers actually reacted, not how they could have reacted. *Id.* at 614-16. Defendants are seeking monetary damages, and to do so they must show actual deception, i.e., that the alleged misleading statements in the letter actually deceived consumers about defendants and their commercial activities.

31

Defendants have presented no consumer surveys or any other evidence of actual deception. They merely argue in conclusory fashion that they have been damaged as evidenced by the testimony of Ledford regarding lost sales and the calculations of their damages witness, Perdue. The testimony of Ledford clearly fails to establish any actual deception since he cannot even recall seeing or reading the letter. Ledford also testified that his failure to do business with Mil-Spec is not based on anything negative PPG said about defendants but rather on his fear that their business might not survive this large lawsuit. He does not want to be left with orders for tinted paint that cannot be filled by defendants. Ledford's testimony in no way demonstrates that a "significant portion" of consumers were deceived about defendants by the letter. The calculations by defendants' witness Perdue for damages under the Lanham Act also do not reflect the use any customer surveys or other evidence that demonstrates actual deception in a "significant portion" of consumers.

A similar problem exists with the causal connection requirement for this claim. There is no market research or consumer testimony or other evidence to establish causation of harm to the defendants. Again, Ledford's testimony does not advance defendants' claim since he did not see the letter nor did he refuse to do business with Mil-Spec because of statements by PPG. Defendants have not shown that their business lost sales or had sales diverted because of the statements in the letter, a letter that does not reference defendants by name. "Without evidence of a causal link, any damages would be purely speculative and prohibited by the Lanham Act." *Sheridan Furniture, Inc. v. Kincaid Furniture Co., Inc.*, No.

32

3:98-CV-16-R, 1999 WL 33603128, at *5 (W.D.Ky. Nov. 24, 1999).

Defendants also contend that the statements made to Mike Walker, a paint company owner, by PPG personnel are a basis for a Lanham Act claim. Initially, the court observes that the statements regarding shutting down Mil-Spec and putting the defendants in bankruptcy are statements reflecting PPG's intention rather than statements of fact. PPG argues that the statements are opinions and thus not actionable under the Lanham Act. Arguably these statements are mere opinion in that they express PPG's thoughts or sentiments regarding the defendants.

In any event, the statements were made to a single customer and under the circumstances of this case do not constitute advertising or promotion. "A particular communication constitutes commercial advertising or promotion only if it is disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. The extent of the required dissemination varies depending on the size of the market." *Dow Corning Corp. v. Jie Xiao*, No. 11-10008-BC, 2011 WL 2015517, at *10 (E.D. Mich. May 20, 2011) (internal quotation marks and citation omitted). A single communication can be sufficient if the size of the market is very small. *See Champion Labs., Inc. v. Parker-Hannifin Corp*., 616 F. Supp. 2d 684, 695-96 (E.D. Mich. 2009) (market consisted of a single client, so single communication sufficient). The market in this case is estimated by defendants to be as many as 10,000 customers, hardly a uniquely small market. Thus, the statements to Walker do not constitute advertising or promotion. Further, the

statements were not sufficiently widespread to be introduced into interstate commerce as required to make a Lanham Act claim.

In addition, no causal connection to any harm exists in relation to the statements made to Walker. Defendants have not demonstrated harm generated by the statements to Walker, primarily since he testified that he still buys paint from Mil-Spec. Accordingly, defendants' Lanham Act claim cannot be established based on the statements to Walker.

Defendants also base their Lanham Act claim on the statements made by PPG about the price of its paints as part of an alleged predatory pricing scheme. The court has already addressed the issue of defendants' allegations regarding a predatory pricing scheme by PPG. The record does not support predatory pricing by PPG as that term is defined and used in the case law.

As to PPG's quoting lower prices when bidding against Mil-Spec for business, defendants have not shown that PPG failed to sell paint to a customer at the reduced price it quoted. PPG apparently did in fact sell paint for a reduced price to out bid Mil-Spec, so the price was not false in that respect. If PPG sold the paint at the quoted price, it was not presenting a false representation regarding that specific sale. The argument can be made that the pricing statements are true but misleading or ambiguous under the facts described by Matthews. Even so, however, defendants must show actual deception to obtain monetary damages and also must still show a causal connection to harm. Defendants have not made

34

these showings specifically regarding these pricing statements. As discussed above, defendants have not presented customer surveys or other evidence to show actual deception, i.e., that customers perceived the pricing statements in such a way that they were misled about PPG's product and its price. Again, defendants' contention that the testimony of Ledford establishes harm or monetary damages is misplaced. His not doing business with defendants is not based upon pricing statements made by PPG sales personnel but a personal decision not to buy from a company embroiled in a large lawsuit.

Therefore, defendants have not established the necessary elements to maintain a Lanham Act claim. Summary judgment is thus appropriate.

## IV.

### *Conclusion*

Accordingly, for the reasons stated above, plaintiffs' motion for summary judgment will be granted, and the counterclaims will be dismissed. An order consistent with this opinion will be entered.

ENTER:

_____
s/ Leon Jordan
United States District Judge